11-2917-cv
Price Trucking Corp. v. Norampac Indus., Inc.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2012

(Argued: September 24, 2012                     Decided: March 18, 2014)

Docket No. 11-2917-cv

------------------------------------

Price Trucking Corp.,

*Plaintiff-Counter-Defendant-Appellee*,

- v -

Norampac Industries, Inc.,

*Defendant-Counter-Claimant-Appellant.*

------------------------------------

Before:        KATZMANN, *Chief Judge*, and STRAUB and SACK, *Circuit Judges*.

Appeal from a judgment of the United States District Court for the Western District of New York (Richard J. Arcara, *Judge*).  The district court, upon the report and recommendation of Magistrate Judge Hugh B. Scott, granted the plaintiff partial summary judgment on the issue of liability, and subsequently entered final judgment at the request of both parties.  The district court

concluded that the federal Comprehensive Environmental Response, Compensation, and Liability Act permitted the plaintiff subcontractor to recover the value of unpaid work directly from the defendant landowner, although the landowner had already paid the general contractor for the plaintiff's work, and the general contractor had failed to make the required payments to the subcontractor. Because we conclude that the Act does not impose such liability, the judgment of the district court is

REVERSED and the case REMANDED.

_____

JOHN GILBERT HORN (Craig A. Slater, *of counsel*), Harter Secrest & Emery LLP, Buffalo, N.Y., *for Appellant*.

KEVIN M. HOGAN, Phillips Lytle LLP (Patricia A. Mancabelli, *of counsel*), Buffalo, N.Y., *for Appellee*.

SACK, *Circuit Judge*:

This dispute presents an issue of apparent first impression regarding the federal Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). The defendant, a landowner, paid a general contractor for costs associated with the cleanup of a contaminated parcel of land that the defendant owned. The general contractor failed, however, to remit those payments to the

plaintiff, a subcontractor who had performed work on the site. The plaintiff then sought payment directly from the defendant landowner. The sole question presented on appeal is whether CERCLA grants the subcontractor a right of recovery against the landowner in these circumstances, effectively requiring the landowner to pay twice for the same work performed – once to the contractor and once to the subcontractor. We conclude that it does not. Accordingly, we reverse the district court's grant of partial summary judgment to the plaintiff subcontractor and remand the case with instructions to grant summary judgment in favor of the defendant.

## BACKGROUND

The principal facts underlying this lawsuit are undisputed. At all relevant times, the defendant Norampac Industries, Inc., owned a parcel of land in Erie County, New York. After Norampac discovered that soil at the site contained levels of lead and other contaminants that exceeded maximums set by the New York State Department of Environmental Conservation ("DEC"), the company entered into a Brownfield Site[1] Cleanup Agreement with the DEC. The

---

[1] The New York Environmental Conservation Law, pursuant to which this agreement was entered into, defines a "Brownfield site" as "any real property, the redevelopment or reuse of which may be complicated by the presence or potential presence of a contaminant." N.Y. Envtl. Conserv. Law § 27-1405(2); *see also* 42 U.S.C. § 9601(39)(A) (setting out a similar definition under CERCLA).

3

Agreement required Norampac to prepare and submit a plan for investigating and remedying the soil contamination.

In October 2007, pursuant to its cleanup obligations under the Agreement, Norampac contracted with AAA Environmental, Inc., a contractor located in upstate New York, to perform remedial work, including the excavation and removal of contaminated soil. The contract required that Norampac make "progress payments" to AAA Environmental at regular intervals based on the amount of work completed. The agreement between Norampac and AAA Environmental required the contractor to furnish performance and payment bonds in amounts equal to the total contract price, but these requirements were waived in a contract addendum.

In December 2007, AAA Environmental subcontracted with Price Trucking to transport from the site and dispose of the contaminated soil. Throughout the following year, Price Trucking hauled the soil to licensed disposal facilities.

AAA Environmental initially paid Price for this service, but on or about October 6, 2008, the payments stopped. Once AAA Environmental refused to pay outstanding invoices, Price Trucking stopped working on the project, insisting that Norampac first agree to pay Price Trucking directly for its portion

4

of all subsequent services performed. Norampac agreed to this arrangement, and made direct payments to Price for the final stages of its work.

As of September 19, 2008, the parties had substantially finished work on the site, and the DEC subsequently certified completion. By that time, Norampac had paid AAA Environmental more than $3 million for services related to the cleanup effort, in addition to the payments that Norampac had made directly to Price Trucking pursuant to the arrangement noted above. But Price was unable to recover the balance of the payments due to it from AAA Environmental. Other subcontractors who worked on the site also complained that they had not been paid in full. The parties agree that Price completed its work in compliance with the Agreement, the contract between Norampac and AAA, the subcontract between AAA and Price, and all applicable laws and regulations, and that Price received no objections from AAA Environmental, Norampac, or the DEC regarding its work.

On November 16, 2009, Price Trucking instituted this lawsuit against Norampac in the United States District Court for the Western District of New York, seeking $780,204.08 in unpaid bills for its work regarding the site. Price's sole theory of recovery in this action was premised on CERCLA's liability

5

provision, codified at 42 U.S.C. § 9607, the relevant provisions of which are discussed below.

On March 31, 2010, Price moved for partial summary judgment against Norampac on the issue of liability. Norampac cross-moved for summary judgment and an order dismissing the lawsuit. On June 17, 2010, Magistrate Judge Hugh B. Scott recommended that the district court rule in favor of Price Trucking on both motions. *Price Trucking Corp. v. Norampac Indus., Inc.*, No. 09-cv-990A, 2010 WL 4069223, 2010 U.S. Dist. LEXIS 113216 (W.D.N.Y. June 17, 2010). District Judge Richard J. Arcara subsequently adopted the report's findings and recommendations, found in favor of Price on the issue of liability, and scheduled a trial to assess damages. *Price Trucking Corp. v. Norampac Indus., Inc.*, No. 09-cv-990, 2011 WL 767702, 2011 U.S. Dist. LEXIS 18631 (W.D.N.Y. Feb. 25, 2011).

Instead of litigating the issue of damages, the parties stipulated that if there were liability, the damages were equal to the outstanding sum owed to Price Trucking: $631,257.02, plus interest. This amount is less than that stated in the complaint, reflecting, among other things, amounts recovered by Price Trucking in one of two related state court lawsuits, although the suits were pending at the time this appeal was brought.

6

In the first such state-court action, Price Trucking sought to foreclose on a mechanic's lien imposed on Norampac's real property. *See* Second Am. Verified Compl. & Supplemental Summons, ¶¶ 27-35, *Price Trucking Corp. v. Norampac Indus., Inc.*, No. 001547/2009 (N.Y. Sup. Ct. Erie Cnty. Nov. 12, 2009) (now consolidated in Case No. 000116/2009). In the same action, Price Trucking brought claims against AAA Environmental and its owner on theories of, *inter alia*, breach of contract, quantum meruit, unjust enrichment, and breach of trust. *Id.* ¶¶ 36-72. It appears that Price Trucking has so far been unable to recover from AAA directly; Norampac has asserted that AAA is out of business. But Price Trucking did recover $131,576.27 plus interest from Norampac on its lien-foreclosure claim.[2]

Price Trucking also brought a state-court action against First Niagara Bank, one of AAA's creditors, on behalf of itself and other similarly situated

---

[2] Pursuant to the general contract, Norampac withheld five percent of each progress payment, pending completion of the entire project (the "Retention"). In the state court proceedings, Norampac acknowledged that it had retained nearly $200,000 in this manner, and stated its willingness "to pay the Retention to whomever the Court directs." Am. Answer, ¶¶ 41, 47, *Price Trucking Corp. v. Norampac Indus., Inc.*, No. 001547/2009 (N.Y. Sup. Ct. Erie Cnty. June 9, 2009), J.A. 68. The state court ordered that Norampac pay this amount, plus interest, into court, and then distributed this sum pro rata among the subcontractors who held liens against Norampac's property. The $131,576.27 that Price recovered in the lien action constituted its portion of this amount.

subcontractors. *See Price Trucking Corp. v. AAA Envtl., Inc.*, 111 A.D.3d 1315, 1316, 974 N.Y.S.2d 733, 733-34 (4th Dep't 2013). The complaint asserted that AAA Environmental had maintained a line of credit with Niagara, the terms of which allowed the bank automatically to debit AAA's operational account on a nightly basis to reduce any amounts owed under the line of credit. *Id.* Price Trucking and its co-plaintiffs argued that this arrangement violated New York Lien Law by effectively diverting assets that should have been held in statutory trust for the subcontractors. *Id.* The trial court found in Price's favor. But on November 8, 2013, the Appellate Division ruled for Niagara and modified the Supreme Court's order accordingly. *Id.* at 1316, 1318, 974 N.Y.S.2d at 733, 735.

In light of the pendency of the state proceedings, the parties prepared a consent order setting out the amount that would be the subject of this appeal and providing that any additional amounts recovered in state court would further reduce the amount of the federal claim. The district court adopted this order, and, on June 24, 2011, entered final judgment in favor of Price Trucking.

Norampac appeals.

## DISCUSSION

The sole question presented by this appeal is whether CERCLA creates direct liability between owners and subcontractors with respect to cleanup on a

8

CERCLA site when the owner has paid a general contractor in full for the subcontractor's work. The district court concluded that CERCLA does impose such liability. For the reasons stated below, we disagree.

"We review a district court's decision grant of summary judgment *de novo*, viewing the evidence in the light most favorable to the non-moving party and drawing all inferences and resolving all ambiguities in its favor." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 122 (2d Cir. 2013) (internal quotation marks omitted). "Specifically, [where] the district court's disposition presents only a legal issue of statutory interpretation[,] we review *de novo* whether the district court correctly interpreted the statute." *City of Syracuse v. Onondaga Cnty.*, 464 F.3d 297, 310 (2d Cir. 2006) (internal quotation marks, ellipsis, and brackets omitted); *accord New York v. Next Millenium Realty, LLC*, 732 F.3d 117, 126 (2d Cir. 2013) (stating that the interpretation of CERCLA "is a question of law that we review *de novo*").

**I. CERCLA**

CERCLA's "primary purposes are axiomatic: (1) to encourage the timely cleanup of hazardous waste sites; and (2) to place the cost of that cleanup on those responsible for creating or maintaining the hazardous condition." *W.R. Grace & Co.-Conn. v. Zotos Int'l, Inc.*, 559 F.3d 85, 88 (2d Cir. 2009) (internal

quotation marks and brackets omitted).  In furtherance of these purposes, the statute imposes strict liability on owners and facility operators, on persons who arranged for the disposal or treatment of hazardous waste at the relevant site, and on persons who transported hazardous waste to the site. *See* 42 U.S.C. § 9607(a)(1)-(4); *Marsh v. Rosenbloom*, 499 F.3d 165, 178 (2d Cir. 2007) ("CERCLA looks backward in time and imposes wide-ranging liability"); *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1042-44 (2d Cir. 1985) (noting that the statute imposes liability on identified persons regardless of whether they "caused" the release of hazardous substances).

CERCLA imposes liability for response costs incurred both by the government and by private parties.  42 U.S.C. § 9607(a)(4)(A)-(B); *Marsh*, 499 F.3d at 178.  With respect to costs incurred by private parties, the statute provides that the responsible parties are liable for "any . . . necessary costs of response incurred by any . . . person consistent with the national contingency plan."[3]  42 U.S.C. § 9607(a)(4)(B).  This liability exists "[n]otwithstanding any other provision or

---

[3] The National Contingency Plan "provide[s] the organizational structure and procedures for preparing for and responding to discharges of oil and releases of hazardous substances, pollutants, and contaminants," and is promulgated by the Environmental Protection Agency.  National Contingency Plan, 40 C.F.R. §§ 300.1-2.

rule of law," *id.* § 9607(a), and is subject to only a limited set of statutory defenses, *id.* § 9607(b), not relevant here.

To make out a prima facie case for liability under the Act, a plaintiff must establish that: (1) the defendant is an "owner" or is otherwise liable under 42 U.S.C. § 9607(a)(1)-(4); (2) the site is a "facility" as defined by 42 U.S.C. § 9601(9); (3) there has been a release or threatened release of hazardous substances at the facility; (4) the plaintiff incurred costs responding to the release or the threat; and (5) the costs and response conform to the National Contingency Plan. *Prisco v. A & D Carting Corp.*, 168 F.3d 593, 602-03 (2d Cir. 1999); *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1198 (2d Cir. 1992). For the purposes of 42 U.S.C. § 9607(a)(4)(B), which underlies the present claim, the plaintiff must also show that the costs incurred were "necessary." *W.R. Grace*, 559 F.3d at 95.

The parties have stipulated for the purposes of this litigation that Norampac owned the site at issue, that the site was a "facility" within the meaning of the statute, and that there were releases or threatened releases of hazardous substances at the site. We also assume without deciding that Price Trucking's actions were consistent with the National Contingency Plan.[4] Finally,

---

[4] The parties agree that the cleanup was conducted in compliance with all applicable regulations, which would include the National Contingency Plan. Norampac nonetheless argued before the magistrate judge that Price Trucking's

11

Norampac does not contest that Price Trucking "incurred" certain costs in relation to the cleanup effort, although it denies that these are "response costs" within the meaning of the Act.

There is no serious question as to whether the cost of removing contaminated soil constituted "response costs" within the meaning of CERCLA.[5] The issue here is when and how liability for such costs is discharged by the owner of the site in question. Norampac contends that CERCLA liability is

costs were not within the plan, because only Norampac, and not its contractors, could be considered a responder within the meaning of the plan. *Price Trucking*, 2010 WL 4069223, at *7, 2010 U.S. Dist. LEXIS 113216, at *21-*22. The magistrate judge rejected this argument, *id.*, and the district court adopted its recommendations in full, *Price Trucking*, 2011 WL 767702, 2011 U.S. Dist. LEXIS 18631. Norampac does not renew its contention on appeal.

[5] Under CERCLA, "response" refers to any removal or remedial action. 42 U.S.C. § 9601(25). The term "remedial action," in turn, "includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials." 42 U.S.C. § 9601(24). The activities that Price Trucking was hired to perform fall squarely within this definition. There is no allegation that Price's transport of contaminated soil was somehow unnecessary to the cleanup effort, or that this work would have been undertaken even if there were no contamination. The cost of soil removal is therefore, in principle, recoverable under CERCLA. *Cf. United States v. W.R. Grace & Co.*, 429 F.3d 1224, 1244 (9th Cir. 2005) (explaining that CERCLA removal actions include "permanent solutions such as . . . soil or drum removal" (internal quotation marks omitted)), *cert. denied*, 549 U.S. 951 (2006). But Norampac argues that, although these costs may be theoretically recoverable under the statute, they are not recoverable by contractors. We briefly address this argument *infra* in Part II.C.

satisfied when the response is complete and when the landowner has made its payments pursuant to the applicable contracts entered into to effect the cleanup. In Price Trucking's contrary view, liability on the part of the landowner persists until all parties who contributed to a cleanup operation are made whole for all costs of their work.

The parties phrase their arguments in terms of whether the payments demanded by Price from Norampac constitute "necessary costs of response." But, in simple terms, the issue in this case is not whether CERCLA requires Norampac to pay for the cleanup. The sole question is whether – under the circumstances presented here – CERCLA also requires Norampac to ensure that Price is made whole for its work.[6]

**II.    Analysis**

*A.    Text of 42 U.S.C. § 9607(a)*

Although CERCLA defines "response" to encompass a range of activities, it does not define the term "response costs." *See* 42 U.S.C. § 9601(23)-(25); *Gussack*

---

[6] If Price Trucking had stated a prima facie case for recovery of necessary costs, then we would have to ask whether Norampac could nonetheless escape liability by invoking a statutory or extra-statutory defense. Because we answer the threshold question in the negative, we need not reach the issue of defenses.

13

*Realty Co. v. Xerox Corp.*, 224 F.3d 85, 91 (2d Cir. 2000) (per curiam). Nor does the statute specify how an owner may discharge its liability for such costs.

The statute provides that the term "'liability' . . . shall be construed to be the standard of liability which obtains under section 311 of the Federal Water Pollution Control Act." 42 U.S.C. § 9601(32). But this cross-reference has been read, correctly we think, to mean "no more than that CERCLA, like the FWPCA, is a strict liability statute." *Town of Munster, Ind. v. Sherwin-Williams Co.* 27 F.3d 1268, 1272 (7th Cir. 1994); *see also Shore Realty*, 759 F.2d at 1042 (noting that courts have construed the statute's reference to the Clean Water Act to impose strict liability). And, in any case, determining the *standard* of liability is of little assistance in deciding the *extent* of a party's liability, which is the relevant question here. *Cf. United States v. Chem-Dyne Corp.*, 572 F. Supp. 802, 805 (S.D. Ohio 1983) (concluding that CERCLA was clear as to its "standard of liability," but ambiguous with respect to the "scope of liability," *i.e.*, whether liability is joint and several).

Even bearing in mind that "response costs are liberally construed under CERCLA," *W.R. Grace*, 559 F.3d at 92, we find nothing on the face of the statute that compels either the conclusion that, in the circumstances presented here,

14

liability has been discharged, as Norampac argues, or that it persists, as Price Trucking contends.

B.     *Purpose of the Liability Provision*

"Congress passes legislation with specific purposes in mind.  When the ordinary tools of statutory construction permit us to do so, we must attempt to discover those purposes from the text, structure and history of the acts in question."  *N.Y.C. Health & Hosps. Corp. v. Perales*, 954 F.2d 854, 862-63 (2d Cir.), *cert. denied*, 506 U.S. 972 (1992); *accord Internal Revenue Serv. v. WorldCom, Inc.*, 723 F.3d 346, 360 (2d Cir. 2013).  This Court has long understood that "Congress enacted CERCLA with the expansive, remedial purpose of ensuring that those responsible for any damage, environmental harm, or injury from chemical poisons bear the costs of their actions."  *Schiavone v. Pearce*, 79 F.3d 248, 253 (2d Cir. 1996) (internal quotation marks omitted); *see also W.R. Grace*, 559 F.3d at 88 (a primary purpose of CERCLA is "to place the cost of . . . cleanup on those responsible for creating or maintaining [a] hazardous [environmental] condition" (internal quotation marks and brackets omitted)).

CERCLA accomplishes that purpose in two relevant ways.  First, it imposes liability on a range of persons, including not only the property owner who might have been responsible for environmental damage, but other owners,

operators, arrangers, or transporters. 42 U.S.C. § 9607(a)(1)-(4); *B.F. Goodrich Co.*, 958 F.2d at 1198; *see* S. Rep. No. 96-848, at 11 (1980) (noting the need for legislation to "address those situations where an owner is unknown or is unable to pay the cleanup costs").[7] Second, the statute adopts a strict liability regime similar to "the common law of ultra-hazardous activities," without regard to fault or negligence. *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 120 (2d Cir. 2010); S. Rep. No. 96-848, at 32; *see also* Richard B. Stewart & Bradley M. Campbell, *Lessons from Parent Liability Under CERCLA*, Nat. Resources & Env't, Winter 1992, at 7, 8 (explaining the ways in which this aspect of CERCLA deviates from common-law tort liability). CERCLA thus operates to establish

---

[7] As we have observed, "CERCLA was hastily enacted and was a combination of three other toxic waste and oil spill cleanup bills that had not passed." *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 130 n.23 (2d Cir. 2010). Because the Act, in its final form, "has scant legislative history," we "look to the history of the three other bills that informed the final product." *Id.* In this case, we rely primarily on the Senate report accompanying the initial draft of the Senate's version of CERCLA, S. 1480. *See* S. Rep. No. 96-848 (1980). Although aspects of the liability provision changed from the Senate's initial draft, the Senate report sets forth the most detailed justification for a strict-liability standard under CERCLA, *see id.* at 13-15, 31-37, which is the focus of this dispute and of this opinion. This aspect of the liability provision largely survived Congress's revisions. *See* Frank P. Grad, *A Legislative History of the Comprehensive Environmental Response, Compensation and Liability ("Superfund") Act of 1980*, 8 Colum. J. Envtl. L. 1, 21-22, 30 (1982).

liability on the part of a potentially large group of landowners, facility operators, intermediaries, and transporters.

By clearing the path to liability of any obstacles or inconsistences imposed by varying state laws, CERCLA "encourage[s] private parties to assume the financial responsibility of cleanup by allowing them to seek recovery from others." *Key Tronic Corp. v. United States*, 511 U.S. 809, 819 n.13 (1994) (quoting *FMC Corp. v. Aero Indus., Inc.*, 998 F.2d 842, 847 (10th Cir. 1993)); *accord W.R. Grace*, 559 F.3d at 94; *see also* S. Rep. No. 96-848, at 31 (1980) (stating that CERCLA "is intended to induce potentially liable persons to voluntarily mitigate damages rather than simply rely on the government to abate hazards"). But while CERCLA obviously is designed to facilitate cost recovery, it does so through the assignment of tort-like liability and the clarification of the relevant standards; it does not provide for cost recovery in all cases and in all circumstances.[8]

And if the responsibility-assigning function of CERCLA will facilitate cost recovery by private parties in most cases, it need not and does not do so in every

---

[8] In this respect, we have previously noted that CERCLA's cost-recovery function is not absolute. The statute does not "automatically assign liability to every party with any connection to a contaminated facility," *Commander Oil Corp. v. Barlo Equip. Corp.*, 215 F.3d 321, 327 (2d Cir.), *cert. denied*, 531 U.S. 979 (2000), and the "statutory scheme anticipates that, in some situations, it will be impossible to recover from responsible parties," *Marsh*, 499 F.3d at 178.

case.  In the typical private cost-recovery action, an injured landowner undertakes a cleanup effort and then brings suit against a responsible facility owner or operator under CERCLA.  By holding the defendant liable in such a case, CERCLA ensures that defendant owners and operators "bear the cost of their actions." *Schiavone*, 79 F.3d at 253 (internal quotation marks omitted).  But the case before us is hardly typical.  Norampac has undisputedly accepted responsibility for the cleanup, has seen that the operation is completed, and has shouldered the costs of removing contaminated soil through its payments to AAA Environmental and direct payments to Price Trucking.  Stipulation of Facts, ¶¶ 3, 11-12, 14-16, at J.A. 271-73.  In other words, Norampac has already borne the cost of its actions.  In seeking to treat Norampac as though it were a surety to its subcontract with AAA Environmental, Price Trucking pushes the terms of CERCLA beyond their intended assignment of responsibilities.

CERCLA's purposes are served when landowners and others who profit from hazardous activities are made to bear the costs of accidents on their land. *See, e.g.*, *Commander Oil Corp. v. Barlo Equip. Corp.*, 215 F.3d 321, 330 (2d Cir.) (noting Congress's reference in crafting CERCLA to "the underlying fairness of imposing on the beneficiaries of an ultra-hazardous activity the ultimate costs of that activity"), *cert. denied*, 531 U.S. 979 (2000); S. Rep. No. 96-848, at 13 ("Strict

18

liability . . . assures that those who benefit financially from a commercial activity internalize the health and environmental costs of that activity into the costs of doing business."). They do so by paying the costs of cleanup out of their own pockets. Once these payments are made, and the cleanup is complete, their liability under the statute is discharged. There is no need – and CERCLA is not designed – to hold the responsible party perpetually liable as a surety in any dispute relating to the cleanup between or among contractors, subcontractors, employees, or suppliers.[9]

C.      *Role of State Law*

We note, finally, that state law provides a well-developed, if not necessarily effective, system for resolving disputes like this one. "It is well settled that a subcontractor may not assert a cause of action to recover damages for breach of contract against a party with whom it is not in privity." *Perma Pave Contracting Corp. v. Paerdegat Boat & Racquet Club, Inc.*, 156 A.D.2d 550, 551, 549

---

[9] This conclusion is consistent with the statutory language, which makes clear that the persons in 42 U.S.C. § 9607(a)(1)-(4) – as distinguished from victims, third parties, and the government – "shall be liable for" response costs. 42 U.S.C. § 9607(a)(4). It does not state that a landowner "shall be liable to" every contractor, subcontractor, employee, and material supplier who assists in the response. *Cf. Key Tronic*, 511 U.S. at 818 n.11 (noting that the liability provision "merely says that 'A shall be liable,' without revealing *to whom* A is liable"). Nor does the statute explicitly impose the role of surety on a responsible party.

N.Y.S.2d 57, 58 (2d Dep't 1989) (internal citation omitted); *see also* Remediation of Contaminated Materials Contract, Standard General Conditions § 6.06©, J.A. 219 (providing that no contractual obligations would exist between owner and subcontractor). Subcontractors who wish to hold a property owner responsible for unpaid work may proceed instead by placing a mechanic's lien on the owner's property. *See* N.Y. Lien Law §§ 3-4. In New York, this remedy is limited to the extent that the owner has not yet paid a general contractor for the work in question.[10] *Rure Assocs., Inc. v. DiNardi Constr. Corp.*, 917 F.2d 1332, 1335 (2d Cir. 1990); *104 Contractors, Inc. v. R.T. Golf Assocs., L.P.*, 270 A.D.2d 817, 818, 705 N.Y.S.2d 752, 754 (4th Dep't 2000).

In light of our conclusion that CERCLA does not expressly create the liability that the plaintiff seeks to impose, we have no reason to suppose that Congress meant to upend by inference the longstanding principles of common law that bar direct recovery for breach of contract against a party not in privity with the claimant. *See Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952) ("Statutes which invade the common law . . . are to be read with a presumption favoring the

---

[10] Other jurisdictions may permit greater recovery by unpaid subcontractors. *See generally* 53 Am. Jur. 2d *Mechanics' Liens* § 9 (distinguishing the "New York system" from the "Pennsylvania system," which may permit liens for the full amount of the subcontract, regardless of the balance due to the general contractor).

20

retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident."); *see also United States v. Bestfoods*, 524 U.S. 51, 63 (1998) (concluding that CERCLA's silence regarding corporate limited liability suggests that Congress did not intend to abrogate the common-law rule in that area). Moreover, "where federal statutory regulation is comprehensive and detailed, as CERCLA is, we presume that matters left unaddressed are left subject to the disposition provided by state law." *Marsh*, 499 F.3d at 181 (internal quotation marks omitted).[11]

Here, Price Trucking has pursued its remedies under state law with some, albeit limited, success. Norampac has not disputed Price's right, as a subcontractor, to recover unpaid bills by placing a mechanic's lien directly on Norampac's property, at least insofar as payments from Norampac to AAA Environmental remain outstanding. Indeed, as already noted, Price was able to recover more than $130,000 from Norampac through a lien-foreclosure action. Our reading of CERCLA does nothing to close this avenue of recovery, nor does

[11] In *Marsh*, we were asked to craft a rule of federal common law under CERCLA that would have displaced Delaware law regarding actions against dissolved corporations. *Marsh*, 499 F.3d at 181. We declined to do so, in part because "[w]e strongly presume that state law should be determinative where 'private parties have entered legal relationships with the expectation that their rights and obligations would be governed by state-law standards.'" *Id.* (quoting *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 98 (1991)).

it prevent states from providing whatever protections they think fit for subcontractors under their respective lien laws. And we neither express nor imply a view as to whether and to what extent a subcontractor could bring a direct claim against an owner under a quasi-contract or other common-law theory of liability.

Although CERCLA's liability provision may have been designed to impose a uniform standard of strict liability for specified costs, neither its terms nor the legislative history contain a comparable suggestion that the statute is meant to provide a substitution for the usual manner in which contractors and subcontractors are paid. The statute's drafters were doubtless aware that CERCLA responses would be carried out through public and private contracts. *See, e.g.,* 42 U.S.C. § 9619(e)(1)-(2); 40 C.F.R. § 300.400(d)(3). CERCLA contains specific provisions for liens in favor of the United States government for unpaid response costs, 42 U.S.C. § 9607(*l*), and provisions relating to surety bonds in public contracts, 42 U.S.C. § 9619(g). In light of the explicit instructions contained in these provisions regarding public contracts, it seems to us unlikely that the legislators would have displaced only implicitly the existing state law rules regarding contractors and subcontractors working for private parties.

Norampac urges us to go further, and to find that CERCLA does not permit cost-recovery actions by private contractors and subcontractors.[12] Although this Circuit has not addressed the issue, other courts have determined that response contractors may indeed bring cost-recovery actions under certain circumstances. *See, e.g., OHM Remediation Servs. v. Evans Cooperage Co.*, 116 F.3d 1574, 1580 (5th Cir. 1997); *Blasland, Bouck & Lee, Inc. v. City of N. Miami*, 283 F.3d 1286, 1302 (11th Cir. 2002); *Veolia Es Special Servs., Inc. v. Techsol Chem. Co.*, No. 3:07-0153, 2007 WL 4255280, at *5-*6, 2007 U.S. Dist. LEXIS 88127, at *14-*18 (S.D. W.Va. Nov. 30, 2007). The circumstances prevailing in those cases are not present here. Because we agree with Norampac's position on a narrower ground, we need not decide and do not imply a view as to whether there may be cases in which a cleanup contractor or subcontractor could successfully bring a cost-recovery action.

---

[12] Norampac argues that Price Trucking's actions were a "response" only to its subcontract with AAA Environmental, and not directly to the discovery of contaminated soil at the site. This argument would have the practical effect of foreclosing contractors' recourse to CERCLA's cost-recovery provisions, insofar as a contractor's only involvement with the site is as a participant in the response effort.

* * *

The purpose of CERCLA's liability provisions is to ensure that actors responsible for creating or maintaining hazardous environmental conditions bear the costs of their actions. In this case, that purpose was served when Norampac accepted responsibility for cleaning the Erie County site, ensured that the cleanup was completed as planned, and made payments under its contract with AAA Environmental for the removal of contaminated soil. To the extent that Norampac paid for Price Trucking's activities either through direct payments or through payments to its general contractor, it satisfied its responsibility to bear response costs under 42 U.S.C. § 9607(a)(4)(B). CERCLA does not create an additional system of insurance for the benefit of all contractors, subcontractors, employees, or suppliers who work on a cleanup operation.[13] The fact that Price

_____

[13] Insurance is apparently widely available in the form of a payment bond, which guarantees payment to subcontractors. *See generally* H. Bruce Shreves, *Payment Bonds*, *in* Construction Law Handbook § 36.09 (Robert F. Cushman & James J. Myers eds. 1999) (describing a payment bond as "often the last, best hope of recovery where the claimant does not receive payment due to contractor insolvency"). The form contract between AAA Environmental and Norampac provided for a payment bond. Remediation of Contaminated Materials Contract, Standard General Conditions, § 5.01, at J.A. 213. That requirement was waived. *See* Addendum No. 1 to Remediation of Contaminated Materials Contract, § 3, at J.A. 253. Although Price Trucking was not a party to the contract in which the bond requirement was waived, it presumably could have demanded a payment bond as a condition of its agreement to the subcontract. We suspect that maintaining the bond requirement would have, in this case, avoided years of

24

Trucking has been unable to recover a portion of its costs falls outside the scope of Congress's concern in enacting the statute.

**CONCLUSION**

For the foregoing reasons, we REVERSE the judgment of the district court, and we REMAND the case with instructions to deny the plaintiff's motion for summary judgment and to grant summary judgment in favor of the defendant.

---

litigation.